Filed 12/9/13  In re O.N. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re O.N., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E058319 |
| Plaintiff and Respondent, | (Super.Ct.No. J238022) |
| v. | OPINION |
| C.N. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant C.N.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant J.O.

1

Jean-Rene Basle, County Counsel, Kristina M. Robb, Deputy County Counsel, for Plaintiff and Respondent.

J.O. (father) and C.N. (mother) appeal an order terminating their parental rights to their daughter, O.N. Both assert that the court should have applied the beneficial parental relationship exception to the statutory preference for adoption, and J.O. also asserts that he was denied substantive due process because the termination of his parental rights was based solely on C.N.'s mental illness rather than on his own unfitness as a parent.

We will affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

O.N. was detained at birth because mother, who has a history of schizophrenia and bipolar disorder, had discontinued her medications during her pregnancy to protect the health of the baby and did not appear capable of caring for an infant. At the hospital, mother said "numerous times" that the baby was crying and needed to be fed, even though the baby was asleep, and would wake her up to feed her. In addition, mother's moods were unstable and she could not stay focused during conversation.

When a social worker arrived at the hospital, she observed that mother was agitated and that she conversed in a disjointed manner, talking over the social worker, apparently making up grandiose stories about her life, and discussing topics unrelated to the subject of the conversation. Father was present, and indicated that he had concerns about mother's ability to care for the baby, based on her combativeness with him during the pregnancy while she was not taking her medications and seeing and hearing things that were not there. The social worker contacted the maternal grandmother and the

2

paternal grandfather, and both expressed concern about mother's ability to care for the baby and about father's ability to control mother if she became aggressive.

The Department of Children and Family Services (CFS) reported that mother had lost custody of her first child, S.N., who had been removed from mother at birth in 2009, and had ultimately been adopted by the maternal grandmother.

A petition pursuant to Welfare and Institutions Code section 300[1] was filed, alleging that O.N. came within subdivision (b) (failure to protect) as to both parents and subdivision (j) (abuse of sibling) as to mother. Specifically, the petition alleged that mother suffered from mental health issues that impaired her ability to care for and supervise O.N., that she suffered from a substance abuse problem, and that she had engaged in incidents of domestic violence with father. As to father, the petition alleged that he was unable to protect O.N. from mother's unpredictable and sometimes violent behavior, and that he had a history of battery against mother. The petition also alleged that O.N.'s half sibling, S.N., had been removed from mother due to mother's inability to care for and supervise her appropriately, and that O.N. was at risk of similar neglect. S.N. had been removed because of mother's mental illness and substance abuse.

On March 21, 2011, the juvenile court ordered O.N. detained outside the parents' home.

The jurisdiction/disposition report dated April 11, 2011, recommended services for both parents. The report stated that mother had recently been assessed by her

---

[1] All further statutory citations refer to the Welfare and Institutions Code.

psychiatrist, Dr. Nakai.  Dr. Nakai diagnosed her with schizoaffective disorder, bipolar type.  He stated that she suffered from poor concentration, flight of ideas, delusional thought content and extreme paranoia.  He stated that mother's severe depression, irritability, anxiety, insomnia, obsessions and paranoia prevented her from functioning at home.

The report stated that father had been convicted of battery on February 17, 2011, and was on probation until February 16, 2014.  The police report attached to the jurisdiction/disposition report stated that father had tackled mother at a neighbor's apartment and had attempted to drag her out of the apartment by her feet.  Father was extremely intoxicated and refused to provide a statement.  The report also stated that when O.N. was removed from her parents, mother was verbally aggressive toward father and threatened to end their relationship.  Father's family members stated that they were afraid of mother's unpredictable and hostile behavior.

Mother reported that she had seizures as a baby and that she had taken medication for attention deficit disorder (ADD) since she was two years old.  She reported that she had suffered a head injury in car accident when she was seven years old.  She had taken medication for schizophrenia for many years.  She reported that the medications she had been taking since O.N.'s birth were gradually improving her mood and behavior.

Father had used illegal drugs when he was younger.  He had received treatment and had stopped using drugs when he was 20 years old.  He and mother had been in a relationship for about two years before O.N. was born.  They lived together and father was present at O.N.'s birth and was named as the father on O.N.'s birth certificate.

4

Father's family was willing to provide support for the parents' reunification with O.N. O.N. was placed in the care of the paternal grandfather, who lived with the paternal great-grandparents and a paternal great-aunt. All of these relatives provided care for O.N. The parents called daily to receive updates about O.N. and were having visits at the relatives' home.

The report described the first visit between O.N. and her parents at the CFS office. Mother became angry and began to yell when a social worker attempted to assist in changing the baby's diaper. She accused the male social worker of trying to look down the baby's pants. She was verbally aggressive toward father and yelled at the security guard as she left the office. After the first visit, however, mother became less aggressive and reported feeling much happier. The parents generally did well during visits, although mother would frequently stare off into space. After March 29, 2011, CFS authorized visits at the caregiver's home twice a week. The paternal grandfather was to supervise the visits.

The addendum report prepared for the jurisidiction/disposition hearing stated that father had been arrested on April 14, 2011, on a warrant concerning a 2008 battery. He was expected to be released on November 5, 2011.[2] CFS recommended reunification services for father. CFS did not recommend reunification services for mother, based on her severe mental disability and because her parental rights to O.N.'s half sister had been

_____

[2] Father was present at the jurisdiction/disposition hearing on June 14, 2011. It is not clear when he was released from custody.

5

terminated. Two psychological evaluations obtained during the dependency proceedings concerning O.N.'s half sister indicated that because of mother's complex mental problems, it would not be safe for mother to care for an infant.

Mother's continuing mental problems were underscored by the report from the paternal relatives that they were caring for her during father's incarceration, visiting her every morning to check on her. On April 17, 2011, she accused family members of trying to kidnap O.N., leading the family to believe that she had not taken her medication the night before. In addition, in the second addendum report prepared for the jurisdiction/disposition hearing, CFS reported an incident on June 7, 2011, when father came to the caregiver's home to pick up his car. The paternal grandfather asked mother to stay outside, but instead she went into the house and picked up O.N. and began to change her diaper. She "body-slammed" the paternal great-aunt when she asked mother to put the baby down. Mother then grabbed the baby by one arm and ran out of the house. After that incident, the paternal relatives asked that visits take place at the CFS office.

The family was also concerned because O.N. would cry when mother held her, and because mother would become angry when asked to hold O.N. correctly or asked not to smoke in O.N.'s presence. They also reported that during a visit at the CFS office on June 9, 2011, mother accused the paternal grandfather of putting his hand on O.N.'s crotch and said that the paternal grandfather had raped mother six times. The security guard reported that when mother arrived for the visit, she accused him of fondling her at Walmart.

6

At the contested jurisdiction/disposition hearing, testimony was received concerning the body-slamming incident. Father admitted that he was unable to control mother and could not keep her from entering the house. The court found the allegations of the petition true, and found by clear and convincing evidence that removing O.N. from her parents' physical custody was necessary to protect her from substantial danger to her physical or emotional well-being. The court ordered continued reunification services to father and none for mother. The court declared father O.N.'s presumed father. Father was given monitored visitation once a week. Visitation between mother and O.N. was suspended because the court determined that it was detrimental to O.N.

Mother filed a petition for modification, seeking reinstatement of visitation. The petition was granted on November 8, 2011.

During the months following the jurisdiction/disposition hearing, mother and father visited O.N. frequently. Father took a parenting class and a 52-week domestic violence class and participated in individual counseling. He and mother voluntarily engaged in couples counseling and mother voluntarily took a parenting class. Both parents completed the parenting class. Father later completed the domestic violence class. Visitation generally went well, and both parents were affectionate and caring toward O.N., although mother would occasionally leave O.N. alone and "just walk away." However, by the time of the 18-month review hearing, mother's on-going mental health issues caused continued concern about her ability to provide adequate care and supervision. Although CFS believed that reunification with father remained a possibility, it could not recommend returning O.N. to father's care as long as he remained with

7

mother because, as father admitted, he could not supervise mother at all times, and mother remained a risk to O.N.'s safety. Despite being warned that mother's mental health made reunification with father unlikely as long as he remained with mother, the couple married during the 18-month reporting period.

At the 18-month review hearing, father admitted that he could not safely leave O.N. alone in the house with mother, although he did think it was safe to leave her alone in a room with mother, if he was in the house. He also testified that if he were ordered to live separately from mother, he did not know how he could keep her from coming over. When asked if he could choose between O.N. and mother, father was unable to answer the question.

The court concluded that the evidence showed that there would be a substantial risk to O.N. if she were returned to father, because she could not safely be left with mother unless mother had constant supervision. The court found that O.N. could not safely be returned to father based on mother's mental illness. The court found that placing O.N. in father's custody continued to be detrimental to O.N. It terminated father's services and set a section 366.26 hearing. The court ordered continued visitation for both parents. The court informed the parents of their right to obtain review of the order by writ petition.

On December 14, 2012, the court authorized placement of O.N. with her paternal great-aunt and uncle, who were interested in adopting O.N., after concerns had been raised about the appropriateness of her prior placement with the paternal grandfather. O.N. moved to the home of her great-aunt and uncle on January 9, 2013.

8

Shortly before the section 366.26 hearing, both parents filed petitions for modification pursuant to section 388. Mother's petition was summarily denied, as it stated no new evidence or changed circumstances. Father's petition was set for a hearing concurrent with the section 366.26 hearing.

At the section 366.26 hearing, a social worker testified that during the visits she had supervised, both parents had good interactions with O.N., but father guided mother on caring for her. She observed that O.N. would smile upon seeing her parents and would go to them, but mostly to father. She testified that mother's psychiatrist had told her that mother was taking her medication but would not give an opinion as to mother's ability to care for her daughter. She testified that the parents told her they had seen the psychiatrist's associate to obtain an assessment of mother's interactions with O.N., but that they had not produced a report of the findings. The social worker believed that father could parent O.N. on his own, with assistance. She believed that he needed to have someone watching him to make sure he dealt with O.N. appropriately and safely.

The social worker testified that she was concerned about "what happens" if O.N. were returned to both parents and mother failed to take her medication and was acting as O.N.'s sole supervisor at that time. She testified that she had told father before the marriage that return of O.N. to his care alone was a possibility. However, father replied that he loved mother and did not want to be without her. The social worker believed this demonstrated that reunifying with O.N. was not father's first priority and showed that he was not willing to protect her. She recommended terminating parental rights because

9

O.N. would be at risk if mother failed to take her medication or if her medication stopped working.

Father testified that he visited O.N. three or four times a week when he was not working. O.N. called him "dada" and called mother "mama." He testified that he believed that mother was capable of caring for O.N. on her own, but that if he was ordered not to leave her alone with mother, he would see to it that O.N. went to day care or stayed with a relative while he was at work. He did not believe O.N. would be at risk if mother were the sole caregiver while he was briefly unavailable, such as while taking a shower. Father testified that he had completed his case plan in February 2012.

The court found that there was no evidence that father could independently care for O.N. and no expert evidence that mother's behavior would not put O.N. at risk. The court also found that there was no evidence that either parent occupied a parental role for O.N. Rather, he saw only evidence of loving contact. The court found that the burden of proof as to the beneficial parental relationship exception was not met. The court denied father's section 388 petition, terminated parental rights and selected adoption as the permanent plan.

Both parents filed timely notices of appeal.

DISCUSSION

1.

FATHER WAS NOT DENIED SUBSTANTIVE DUE PROCESS

Father contends that he was denied substantive due process because his parental rights were terminated based not on his unfitness as a parent but solely because mother's

10

mental illness was found to render her a risk to O.N.'s well-being. This is simply not the case. At the jurisdiction/disposition hearing, the court found true the allegation that father was unable to protect O.N. from mother's unpredictable and sometimes violent behavior, and it found, by clear and convincing evidence, that there was no reasonable means of protecting O.N. without removing her from the custody of both parents. The evidence, recited above, supports the continued findings that mother could not safely and adequately care for O.N. on her own and that father could not adequately care for and supervise both O.N. and mother.

Father relies on *In re T.G.* (2013) 215 Cal.App.4th 1, in which the court found that a father was denied due process because his parental rights were terminated without any finding of unfitness having been made as to him. *In re T.G.* is inapposite, however, because in that case, there was no finding by clear and convincing evidence that the child's safety and well-being required removal from the father's custody. (*Id.* at pp. 14-23.) Here, in contrast, such findings were made by the requisite clear and convincing evidence. Accordingly, father was afforded due process. (See *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254-256.)

Father also contends that the detriment findings as to him were deficient. However, because detriment findings were made—in contrast to the situation in *In re T.G.*, *supra*, 215 Cal.App.4th 1—father was required to address any perceived deficiencies in those findings in a direct appeal from the disposition order or the subsequent periodic review orders (§ 395), or to file a writ petition from the order terminating services and setting the matter for a section 366.26 hearing. Because he did

11

not do so,[3] his contentions as to the factual or legal insufficiency of those orders are not cognizable in this appeal. (§ 366.26, subd. (*l*)(1), (*l*)(2); Cal. Rules of Court, rule 5.695(h).)

2.

NEITHER PARENT MET THE BURDEN OF PROOF WITH RESPECT TO THE

BENEFICIAL PARENT-CHILD EXCEPTION

Both parents contend that the juvenile court should have found that the beneficial parental relationship exception to the statutory preference for adoption applied and that the order terminating their parental rights must be reversed.

"Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds 'a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. . . .' (§ 366.26, subd. (c)(1)(B).)" (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) Under these provisions, "the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a *compelling* reason for finding that termination of parental rights would be detrimental to the child. The specified statutory circumstances . . . 'must be considered in view of the

---

**3** We take judicial notice that father filed a "no issue" writ, and that we dismissed the petition on November 5, 2012. (*J.O. v. Superior Court*, E057260; Evid. Code, § 452, subd. (b).)

legislative preference for adoption when reunification efforts have failed.'" (*In re Celine R*. (2003) 31 Cal.4th 45, 53, italics added (*Celine R*.).) "'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'" (*Ibid*.)

The parent has the burden of establishing by a preponderance of the evidence that a statutory exception to adoption applies. (*Bailey J*., *supra*, 189 Cal.App.4th at p. 1314.) The parent must show both that a beneficial parental relationship exists *and* that severing that relationship would result in great harm to the child. (*Id*. at pp. 1314-1315.) A juvenile court's finding that the beneficial parental relationship exception does not apply is reviewed in part under the substantial evidence standard and in part for abuse of discretion: The factual finding, i.e., whether a beneficial parental relationship exists, is reviewed for substantial evidence, while the court's determination that the relationship does or does not constitute a "compelling reason" (*Celine R*., *supra*, 31 Cal.4th at p. 53) for finding that termination of parental rights would be detrimental is reviewed for abuse of discretion. (*Bailey J*., at pp. 1314-1315.)

Both parents argue that substantial evidence supports the conclusion that a beneficial parental relationship existed. However, since it is the parent who bears the burden of producing evidence of the existence of a beneficial parental relationship, it is not enough that the evidence supported such a finding; the question on appeal is whether the evidence compels such a finding as a matter of law. (*In re I.W*. (2009) 180 Cal.App.4th 1517, 1528.) As the court in *In re I.W*. discussed, the substantial evidence rule is typically implicated when a defendant contends that the plaintiff succeeded at trial

13

in spite of insufficient evidence. When, however, the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]. [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the [parent's] evidence was (1) uncontradicted and unimpeached and (2) of such character and weight as to leave no room for a judicial determination that it was insufficient to support a finding [in the parent's favor]. [Citation.]" (*Ibid.*, internal quotations marks omitted.) Accordingly, unless the undisputed facts established the existence of a beneficial relationship as a matter of law, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

Here, there is evidence which arguably would have supported a finding that a beneficial parental relationship existed between O.N. and her parents. The evidence showed that both acted in a parental manner while visiting O.N., that O.N. called them "mama" and "dada," and that she shared a bond with both parents. And, we agree with mother that the existence of a beneficial parental relationship does not depend on the

14

child having a primary attachment to the parent or on the parent being the child's primary caretaker. Rather, the exception may apply if the child has a "substantial, positive emotional attachment" to the parent. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) However, even if the juvenile court *could* have found that O.N. shared a beneficial relationship with her parents, that does not mean that the evidence compelled such a finding. It did not.

In any event, even if we assume, for the sake of argument, that the evidence does compel the conclusion that a beneficial parental relationship existed, the ultimate question we must decide is whether the juvenile court abused its discretion by failing to find that termination of parental rights would be so detrimental to O.N. as to overcome the strong legislative preference for adoption. That decision is entrusted to the sound discretion of the juvenile court. (*Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) We cannot find an abuse of discretion unless the juvenile court exceeded the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) "'"'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"'" (*Id.* at p. 319.)

Here, O.N. was removed from her parents' custody as a newborn and she never lived with them. She was only a year and a half old when parental rights were terminated, and she had never spent even a single night in the parents' home. Even though she called them "mama" and "dada," it is not clear that she actually understood that they were her parents or viewed them as parental figures. There was no evidence whatsoever that O.N. would suffer great detriment if parental rights were terminated.

15

Consequently, we cannot say it was an abuse of discretion to fail to conclude that the exception did not apply.

Both parents liken this case to *In re S.B.* (2008) 164 Cal.App.4th 289. In that case, the appellate court reversed a termination order, holding that, contrary to the juvenile court's ruling, the only reasonable inference from the evidence was that the beneficial parental relationship exception applied. In reaching that decision, the court noted that the father maintained regular, consistent and appropriate visitation with the child; he was the child's primary caretaker for three years; when she was removed from his custody he immediately acknowledged his drug use was untenable, started services, maintained his sobriety, sought medical and psychoanalytic services and complied with every aspect of his case plan; and after a year apart the child continued to display a strong attachment to her father. (*Id.* at p. 298.) The court stated: "The record shows S.B. loved her father, wanted their relationship to continue and derived *some measure of benefit* from his visits. Based on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [her father]." (*Id*. at pp. 300-301, italics added.) However, the same court which decided *In re S.B.* later warned that it was an extraordinary case and must be viewed in light of its particular facts. The court emphasized that the opinion "does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." (*In re Jason J.* (2009) 175 Cal.App.4th 922, 937; see also *In re C.F.* (2011) 193 Cal.App.4th 549, 557-559.) Rather, there must be evidence that the relationship "promotes the well-being of the child to such a degree as

16

to outweigh the well-being the child would gain in a permanent home with new, adoptive parents" and that severance of the relationship "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Here, there simply is no such evidence.

Mother also cites *In re Brandon C.* (1999) 71 Cal.App.4th 1530. *Brandon C.*, however, is a social services agency's appeal from an order for guardianship rather than adoption based on the beneficial parental relationship exception. (*Id.* at p. 1533.) In that case, the court held that substantial evidence supported the juvenile court's decision to find the exception applicable. (*Id.* at pp. 1534-1538.) The question before us, however, is whether the juvenile court abused its discretion by finding the exception *not* applicable. *Brandon C.* does not provide any guidance on that issue.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:


RICHLI
J.


CODRINGTON
J.

17